**OTTER TAIL POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION, and**
**Village of Elbow Lake, Minnesota,**
Respondents.

No. 19628.

United States Court of Appeals,
Eighth Circuit.

Aug. 4, 1970.

Rehearing Denied Aug. 24, 1970.

Cyrus A. Field, Field, Arvesen, Donoho, Lundeen & Hoff, Fergus Falls, Minn., for petitioner.

Israel Convisser, Atty., F. P. C., Washington, D. C., for respondent, F. P. C.; Richard A. Solomon, Gen. Counsel, Peter. H. Schiff, Sol., Drexel D. Journey, Asst. Gen. Counsel, and Robert C. McDiarmid, Atty., F.P.C., Washington, D. C., on the brief.

I. L. Swanson, Elbow Lake, Minn., on brief, for respondent, Village of Elbow Lake.

Before VOGEL, BLACKMUN * and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

Following a hearing before the Federal Power Commission, Otter Tail Power Company petitions this court under § 313(b) of the Federal Power Act (16 U.S.C.A. § 824, et seq.) to review and set aside an order requiring interconnection between petitioner and Elbow Lake, a municipal power company, issued pursuant to § 202(b) of the Act. Otter Tail maintains, *inter alia,* that this case is not governed by § 202(b), that the order is a deprivation of property without due process of law, and is not supported by the evidence. We disagree and affirm.

Otter Tail Power Company is an investor-owned utility serving primarily small towns located in western Minnesota and eastern North and South Dakota. Its business is almost exclusively retail as opposed to the wholesale transfer of power. Through the years Otter Tail has established a large integrated system running the full gamut from initial production to final sale of electrical power combined with pool arrangements supplying emergency reserves.

In contrast, Elbow Lake is a small municipally-owned power producer serving only the limits of its political entity. Until 1966 Otter Tail served Elbow Lake, at which time the latter went into both production and sale of electrical power. Otter Tail opposed Elbow Lake's decision in both the state and federal courts.[1]

Elbow Lake supplies its consumers from two generators, each capable of producing 1250 KW's, including a ten percent overload capacity. One generator is used while the other is idle. The peak load for the first year of operation was 1120 KW's and the second year 1245. Thus Elbow Lake was dangerously close to eroding its firm power supply since any figure over the actual overload capacity would require the simultaneous use of both generators, causing a possi-

---

* Blackmun, Circuit Judge, took no part in the disposition of this case.

1. See Otter Tail Power Co. v. MacKichan, 1965, 270 Minn. 262, 133 N.W.2d 511; Otter Tail Power Co. v. Village of Elbow Lake, 1951, 234 Minn. 419, 49 N.W.2d 197. Also attempts by an REA co-op, to bring in an additional line for emergency power supply were delayed by Otter Tail Power Company and Northern States Power Company. See, Rural Electrification Administration v. Northern States Power Co., 8 Cir., 1967, 373 F.2d 686, cert. denied sub. nom., Northern States Power Co. v. Rural Electrification Administration, 1967, 387 U.S. 945, 87 S.Ct. 2079, 18 L.Ed.2d 1332.

ble loss of service should one malfunction during a peak period.

On these facts, the Federal Power Commission ordered installation of a temporary connection between Otter Tail and Elbow Lake for use only in case of such emergency. The connection, which was to last for one year, after final adjudication of this case, was to be made at Elbow Lake's expense and the power paid for at wholesale rates. From this order Otter Tail takes exception.

Otter Tail first maintains the Federal Power Commission is without jurisdiction to order the connection under the Act. Their argument follows two separate but equally unacceptable paths. Petitioner first contends any proceedings in the instant case must be dealt with in compliance with § 202(c) of the Act rather than § 202(b), and secondarily argues that municipalities are not protected under § 202(b) of the Act.[2] We examine each contention separately.

■ Otter Tail argues § 202(b) only applies to permanent connections and a temporary connection may only be ordered under § 202(c). Otter Tail further contends that since Elbow Lake faces no emergency, its request to the Federal Power Commission for a temporary connection falls outside the range of authority granted the Commission by Congress under § 202(c). The contention fails to impress us. On its face, § 202(c) enables the Commission to react to a war or national disaster and order immediate interconnection of the facilities to maintain electrical service during such emergency. As such, the section enables the Commission to proceed without notice or hearing. On the other hand, § 202(b) applies to a crisis which is likely to develop in the foreseeble future but which does not necessitate immediate action on the part of the Commission. In the case at hand, Elbow Lake's first year's peak load was 1120 KW's which increased to 1245 KW's in its second year, just 5 KW's short of their generators' maximum overload capacity. In short, the present case is just the type of situation to fit into a § 202(b) hearing rather than § 202(c). Otter Tail's argument that § 202(b) applies only to permanent and not temporary connections is not well taken. Suffice it to say that § 202(b) merely enumerates connections ordered by the Commission but does not specify either type or duration.

Otter Tail next challenges the Commission's right to order any interconnection between a municipality and a private company under § 202(b) of the Act. The argument bottoms itself on the definitional section of the Act contained in Part I of the statute (16 U.S.C.A. § 796 (3) (4)) combined with the precise wording of § 202(b) and (f) of the Act (16 U.S.C.A. § 824a(b), 824a(f)). Otter Tail maintains that § 3(3) of the Act defines corporation to specifically exclude municipalities, while § 3(4) limits the definition of person to individuals or corporations. Otter Tail then points

---

**2.** § 202 reads, in pertinent part, as follows:

"(b) Whenever the Commission, upon application of * * * *any person* engaged in the transmission or sale of electric energy, and *after notice* * * * and *after opportunity for hearing*, finds such action necessary or appropriate in the public interest it may by order direct a public utility * * * to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: * * *

"(c) During the continuance of *any war* * * * or *whenever the Commis-*

*sion determines that an emergency exists* by reason of a *sudden increase* in the demand for electric energy, * * * the Commission shall have authority, either upon its own motion or upon complaint, *with or without notice, hearing, or report*, to require by order such temporary connections of facilities and such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest. * * *" (Emphasis supplied.)

Elbow Lake initially petitioned under § 202(c) but later amended its petition in compliance with § 202(b).

to the fact that § 202(b) only mentions connections between "persons", which implicitly excludes municipalities. Lastly, § 201(f) is alleged to plainly remove all political entities from coverage of Part II of the Act.[3]

Petitioner finally directs our attention to legislative history to support its analysis. During the hearings on the Act both the Commissioner of the FPC and its solicitor testified that Part II of the Act would not require private companies to be forced to allow governmental agencies to use their facilities. Thus petitioner maintains any ambiguities in the language of the statute are clarified by the history.

■ The Fifth Circuit recently considered and rejected an identical argument. See, Florida Power Corporation v. Federal Power Commission, (May 1, 1970) 425 F.2d 1196. That court concluded that § 201(f) only limits the Federal Power Commission's right to order wheeling by a private utility for a public entity.[4] That court, after examination of the entire legislative history, stated:

" * * * we can find no support for the conclusion that municpalities which generate their own power were to be treated differently from non-generating municipalities concerning anything other than 'wheeling'."

The Fifth Circuit also relied upon New England Power Co. v. Federal Power Commission, 1 Cir., 1965, 349 F.2d 258, which case Otter Tail invites us to distinguish or disagree with. Therein, Judge Maris, with Chief Judge Aldrich and then Circuit Judge Burger concurring, stated for the court at page 262 of 349 F.2d:

"The contention that the Town of Shrewsbury is not a 'person engaged in the * * * sale of electricity' within the meaning of that phrase as

used in section 202(b) is based upon the definition of 'person' in section 3 of Part I of the Act, 16 U.S.C.A. § 796, which when read with the definition of 'corporation' in that section appears to exclude municipalities. The petitioners also rely on section 201(f) which states that 'No provision in this Part shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, or any agency, authority, or instrumentality of any one or more of the foregoing, * * * unless such provision makes specific reference thereto.' 16 U.S.C.A. § 824(f). These contentions have however, heretofore been categorically rejected by the Supreme Court. Construing section 201 (d) which provides that 'The term "sale of electric energy at wholesale" when used in this Part means a sale of electric energy to any person for resale', 16 U.S.C.A. § 824(d), that Court has held that the provisions of Part II of the Act (which part includes section 202) are applicable to municipal subdivisions of the State which purchase electric energy for resale. United States v. Public Utilities Commission of California, 1953, 345 U.S. 295, 73 S.Ct. 706, 97 L.Ed. 1020."

The Fifth Circuit's analysis in *Florida Power Corporation*, supra, is identical with the position adopted by the Federal Power Commission itself. See, City of Paris, Ky. v. Kentucky Utilities Co., 1969, 41 F.P.C. 45. Moreover, as indicated by Judge Maris, the Supreme Court examined the same legislative history and stated:

"We conclude, therefore, that the Congress attached no significance of substance to the addition of the word 'person,' and in fact did not intend it as a limitation on the Commission jurisdiction. * * * " See, United States v. Public Utilities Commission, supra,

---

3.  § 201(f) reads in part:

    "No provision in sections 824–824h of this title shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State,

* * * unless such provision makes specific reference thereto."

4.  Wheeling is a process where one power company carries power for a second company's customers.

345 U.S. 295, at 313, 73 S.Ct. 706, at 717.

We agree with *Florida Power·Corporation* and the Commission's analysis of the statutory scheme and are further bound by the Supreme Court's definition of the word "person". Accordingly, we reject Otter Tail's contention. Having disposed of Otter Tail's statutory contentions, we turn to its argument founded on due process and sufficiency of evidence.

Otter Tail contends any order which requires interconnection with a former customer turned competitor takes its property without due process. Otter Tail introduced evidence tending to show that other municipal purchasers were thinking of building their own power plants and forcing Otter Tail to supply Elbow Lake would merely encourage them to do likewise. Thus, as Otter Tail contends, Elbow Lake is the first domino in a series to fall once the Federal Power Commission converts § 202(b) into an economic suicide pact.

We believe Otter Tail misconceives the variety of interests involved and the actual scope of the order in question. Were this a conflict solely between Otter Tail and Elbow Lake, the argument might be well founded; but the controversy is not so limited. The consumers of Elbow Lake must also be considered, some, we dare say, who perhaps opposed their village's move into the power business. In short, the public also has a stake in this controversy. Cf., Cincinnati Gas & Electric Co. v. Federal Power Commission, 6 Cir., 1968, 389 F.2d 272, cert. denied, 393 U.S. 826, 89 S.Ct. 89, 21 L.Ed.2d 97. Moreover, the order is temporary in effect and only requires service of electricity in periods of actual need.

When assessing administrative regulation of public utilities, due process requires a delicate balancing of all interests involved. If the public interest outweighs the inconvenience and expense to the corporation, the order will generally be upheld. See, Michigan Central R. R. v. Michigan Railroad Commission, 1915, 236 U.S. 615, 628–631, 35 S.Ct. 422, 59 L.Ed. 750. Usually a governing agency may compel interconnection and exchange of commodities between two or more public utilities so long as the order is reasonable and in the public interest. See, Washington ex rel. Oregon Railroad & Navigation Co. v. Fairchild, 1911, 224 U.S. 510, 32 S.Ct. 535, 56 L.Ed. 863; Wisconsin, Minnesota & Pacific R. Co. v. Jacobson, 1900, 179 U.S. 287, 21 S.Ct. 115, 45 L.Ed. 194. At times even heavy out-of-pocket expenses may be imposed when acute public need is established. E.g., Atchison, Topeka & Santa Fe R. Co. v. Railway Commission of California, 1931, 283 U.S. 380, 51 S.Ct. 553, 75 L.Ed. 1128.[5] However, while every connection is not blindly approved by the courts, the mere fact that it is made with a competitor does not in itself render the action illegal.

In this case we note the connection is only temporary until Elbow Lake finds another reserve which may range from purchase of another generator to having a separate line run from another company or cooperative. The connection must be performed at Elbow Lake's expense and Otter Tail will be compensated if and when electricity is used. At this point, we hold the order is no violation of the Fifth Amendment.

Otter Tail lastly argues that the evidence is insufficient to support the order. When examining an order of the Commission, our function is merely to

---

5. Of course, Otter Tail receives many benefits from the Federal Power Act. For example, § 202(a), 16 U.S.C.A. § 824a(a), allows independent companies to establish regional power pools to insure each other against sudden loss of power supply, which is the very thing Elbow Lake is requesting in this case. Otter Tail and private companies also have the right of eminent domain to further their enterprises under the Act. See, Federal Power Act, § 21, 16 U.S.C.A. § 814. Needless to say, privileges beget responsibilities.

determine if there is substantial evidence to support the decision. § 313(b) of the Act, 16 U.S.C.A. § 825*l*(b). Cincinnati, Gas & Electric Co. v. Federal Power Commission, supra, 389 F.2d at 277; Dorchester Gas Producing Co. v. Federal Power Commission, 3 Cir., 1965, 353 F.2d 162, cert. denied, 1966, 383 U.S. 969, 86 S.Ct. 1276, 16 L.Ed.2d 310. In this case the Commission found that each generator's capacity, including its overload, was 1250 KW's. The Commission further found the first year's peak load was 1120 KW's and that increased in the second year to 1245 KW's. We conclude this evidence sufficient to foresee a possible power reserve shortage in the near future. As such, the findings are supported by substantial evidence.

Order affirmed.