**OTTER TAIL POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION et al.,**
Respondents.

No. 72–1088.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 16, 1972.

Decided Feb. 21, 1973.

Cyrus A. Field, Fergus Falls, Minn., for petitioner.

George McHenry, Atty., Federal Power Commission, Washington, D. C., for respondents.

Before HEANEY and STEPHENSON, Circuit Judges, and BOUGE, District Judge.*

STEPHENSON, Circuit Judge.

Otter Tail Power Company appeals from a part of an order of the Federal Power Commission reported at 46 F.P.C. . . . . . (1971). The Commission ordered Otter Tail to permit the Village of Elbow Lake to interconnect its municipal power facilities with Otter Tail's transmission line for purposes of buying electrical power from Otter Tail.

Section 202(b) of the Federal Power Act (16 U.S.C. § 824a(b)) provides:

> (b) Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the

* Of the District of South Dakota, sitting by special designation.

Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

Otter Tail's petition objects to the "terms and conditions of the arrangement" with its essential contention being that the terms provided by the order do not constitute "compensation or reimbursement reasonably due" Otter Tail.

Otter Tail is a privately owned utility within the meaning of the Federal Power Act which serves some 460 small communities in Minnesota, North Dakota and South Dakota. Elbow Lake is a village of about 1,500 persons in Minnesota who from 1913 to 1966 was one of the Otter Tail's electrical energy customers. Otter Tail's franchise with Elbow Lake expired in 1960 and was not renewed. The village attempted to purchase either Otter Tail's distribution system in Elbow Lake or electrical power at wholesale from Otter Tail, who refused. In 1962, the voters of Elbow Lake approved a bond issue to finance the construction of a municipal power system. The new system, completed and operating by 1966, consisted of two small diesel generating units (1136 KW nameplate rating each with a two-hour overload capability of 1250 KW) and a distribution system. The record is replete with evidence showing that this municipal adventure was misguided and unfortunate; that isolated diesel generating systems are inefficient and uneconomic; that in the new system's first year of operations it operated at a loss even though the same rates were charged as before; and that the system had undergone peak hour demands dangerously close to its total capability. Under the circumstances, the system would be unable to satisfy Elbow Lake's expected future needs for power.

In 1966, Elbow Lake applied to the FPC for an order requiring Otter Tail to furnish it with wholesale electric power, claiming that a shortage of energy was imminent. Following a hearing, the FPC in 1968 ordered a "short term" interconnection under § 202(b) pending further study and hearings. This order required Otter Tail to furnish standby power to Elbow Lake for one year and only in the case of actual need. The order was affirmed by this Court at 429 F.2d 232 (C.A. 8 1970), cert. denied, 401 U.S. 947, 91 S.Ct. 923, 28 L.Ed.2d 230 (1971). Elbow Lake, however, made no effort to make the interconnection with Otter Tail.

The Presiding Examiner in 1971 ordered Otter Tail to sell energy at specified wholesale rates to Elbow Lake and to allow the village to establish a long-term interconnection with Otter Tail's transmission line. The Presiding Examiner and the Commission found that Otter Tail with its modern steam plants was fully capable of absorbing the village's full requirements without the necessity of enlarging its facilities, and that the long-term interconnection was necessary and appropriate in the public interest.[1] See § 202(b). Otter Tail does not appeal from this portion of the Commission's order.[2]

1. Elbow Lake's preference was for an order requiring Otter Tail to "wheel" cheaper Bureau of Reclamation power to the village. This request was denied as being beyond the authority of the Commission. See § 201(f) and City of Paris v. Kentucky Utilities Co., 41 FPC 45 (1969).

2. Otter Tail contended before the Commission that the interconnection would amount to a suicide pact for Otter Tail. It charged that several of its municipal customers were considering the establishment of their own power systems and that if the Commission "bails out" Elbow Lake in this instance, many others will follow

## THE TERMS AND CONDITIONS OF THE INTERCONNECTION

The Presiding Examiner and the Commission ordered the sale of Elbow Lake's entire energy requirements on a firm basis.[3] The Commission directed Otter Tail to permit Elbow Lake to make physical connection with Otter Tail's transmission line, with the village to install and pay for the facilities necessary for the interconnection. The rate paid to Otter Tail was to be based upon Otter Tail's fully-allocated cost of firm, wholesale service. The Commission, however, also accepted its staff's recommendation and ordered that Otter Tail must credit against Elbow Lake's monthly billing "one-twelfth of the annual interest plus principal costs of Elbow Lake's generating plant, for each month in which Elbow Lake's existing two diesel generators are in operable condition." Under this part of the order, Otter Tail is, in essence, assuming Elbow Lake's bond issue obligations in full for the duration of the long-term interconnection.

Section 202(b) authorizes the Commission, pursuant to an interconnection order, to prescribe the terms and conditions of the arrangement, "including the apportionment of cost between them and the *compensation or reimbursement reasonably due* to any of them [emphasis added]."

Otter Tail assails this provision of the Commission's order, claiming that this "credit" is not reasonably or appropriately related to *any* value of the two diesel engines as additional reserves for Otter Tail, and as a consequence denies to Otter Tail the "compensation or reimbursement reasonably due" Otter Tail under § 202(b).

In considering this contention we are governed by the recent decision of the Supreme Court in Gainesville Utilities Department v. Florida Power Corporation, 402 U.S. 515, 91 S.Ct. 1592, 29 L.Ed.2d 74 (1971). In *Gainesville*, the Commission had ordered an interconnection on a "standby" basis in order to obviate Gainesville's need to build and maintain a larger reserve generating capacity. Florida Power claimed that Gainesville should pay $150,000 annually as compensation reasonably due it for the backup service provided since the reserves made available to Florida Power from Gainesville were insignificant. The Fifth Circuit agreed with Florida Power, holding that Gainesville was receiving high benefits but no real obligations, and that Florida Power obtained obtained substantial obligations, but no real benefits. "Such imaginary equity is not reasonable compensation." Florida Power Corporation v. Federal Power Commission, 425 F.2d 1196, 1203 (C.A. 5 1970). The Supreme Court reversed, upholding the Commission, stating:

> Insofar as the Court of Appeals' opinion implies that there was not substantial evidence to support a finding of *some* benefits, it is clearly wrong. And insofar as the Court's opinion implies that the responsibilities assumed by Gainesville in combination with the benefits found to accrue to Florida Power were insufficient to constitute "compensation . . . reasonably due," the Court

in Elbow Lake's footsteps causing irreparable damage to Otter Tail's integrated system. We note that several of Otter Tail's customers did in fact follow Elbow Lake's example and that Otter Tail has been held in violation of Section 2 of the Sherman Act for its refusals to sell wholesale or wheel power to its former customers (including Elbow Lake). United States v. Otter Tail Power Company, 331 F.Supp. 54 (D. Minn.1971) prob. juris, noted, 406 U.S. 944, 92 S.Ct. 2039, 32 L.Ed.2d 330 (1972). See 41 U.S.L.W. 3321 (December 12, 1972).

3. The Commission found that "a long-term interconnection between Otter Tail and Elbow Lake, with Elbow Lake taking its full requirements from Otter Tail, would result in Elbow Lake's receiving power at the lowest cost." Elbow Lake, of course, still has the option of not exercising its rights under the interconnection order and purchasing an additional generator for its system.

of Appeals overstepped the role of the judiciary. Congress ordained that that determination should be made, in the first instance, by the Commission, and on that record made in this case, the Court of Appeals erred in not deferring to the Commission's expert judgment. *Gainesville, supra* 402 U.S. at 527, 91 S.Ct. at 1599.

*Gainesville* makes certain our standard of review. We are to search the record to ascertain whether substantial evidence supports the Commission's findings of facts. See § 313(b). The question of whether the Commission's findings and resulting order constitute "compensation or reimbursement reasonably due" is not for our de novo determination. In this highly technical field Congress has explicitly committed this question to the Commission, to whose expertise we must defer. *Gainesville, supra.* See Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 97 L.Ed. 15 (1952) and Federal Power Commission v. Pacific Power & Light Co., 307 U.S. 156, 160, 59 S.Ct. 766, 83 L.Ed. 1180 (1939). *Cf.* Permian Basin Area Rate Cases, 390 U.S. 747, 767 (1968).

In the present case the Commission, while recognizing that Elbow Lake's small diesel units are not an economical method of producing power for a large company, held that Otter Tail would gain "readily demonstrable benefits" from the interconnection.

A review of the record convinces us that substantial evidence supports the finding that Otter Tail acquires some benefits from the interconnection order. The benefits are:

(1) Otter Tail acquires Elbow Lake as a customer.[4]

(2) Elbow Lake's two 1250 KW diesel generators become a standby resource for Otter Tail's generation needs.

Since substantial evidence supports the Commission's findings that Otter Tail will benefit from the interconnection arrangement, we must initially defer to the expert judgment of the Commission on the question of whether the terms and conditions of the arrangement constitute "compensation or reimbursement reasonably due" Otter Tail. Because of our disposition of this part of the Commission's order on another basis, as next set out, we do not now decide whether the compensation determined by the Commission was unreasonable.

Otter Tail also contends that the Commission's order, with the "credit," forces Otter Tail, in substance, to purchase the Elbow Lake generating plant in violation of § 202(b).

The statute limits the Commission's power in ordering interconnections. It provides "That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, . . . ."

The Commission's position is that the proscription applies only to facilities *owned* by a recipient of an interconnection order, and since Otter Tail acquires no title to the Elbow Lake plant, the credit constitutes only the "terms and conditions of the arrangement." We disagree.

On this point the present case differs from *Gainesville.* In *Gainesville*, the recipient of the interconnection order was required to provide standby emergency service and only on an "as available" basis. "Thus the benefits that the Commission found that Florida Power will receive from the interconnection will come without any capital investment on its part." *Gainesville, supra,* 402 U.S. at 528, 91 S.Ct. at 1599.

Here, Otter Tail is to provide all of Elbow Lake's energy requirements on a firm basis. Although Otter Tail will never receive any legal title to Elbow

---

4. We assume that Otter Tail will make a profit under the Commission's order. Both the Commission and Presiding Examiner selected a higher rate schedule than that proposed by the Staff, whose rates and charges would have "diminish[ed] Otter Tail's revenue to a net level of 47 percent below cost."

Lake's generation system, Otter Tail must, in effect, assume the village's obligations under the bond indenture for the duration of the interconnection. Potentially, if the interconnection order is still in effect, by 1987 Otter Tail will have paid for Elbow Lake's entire indebtedness incurred with respect to its generating facilities.

The Commission justifies the credit on the basis that since Elbow Lake's two diesel engines provide a "clear and considerable" gain in generating capacity for Otter Tail, this usefulness must be recognized in the rate Elbow Lake pays Otter Tail for power. This *addition* to Otter Tail's generation capacity plus the requirement that Otter Tail pay for such, in our opinion, clearly constitutes violation of the statutory prohibition against the forced enlargement of generating facilities.[5]

We recognize the Commission may impose "terms and conditions" pursuant to an interconnection order, weighing the responsibilities each party will bear and the benefits each shall receive, and then in its judgment determine what "compensation or reimbursement" is "reasonably due" both. However, when as here, Otter Tail is required to in effect purchase standby facilities the statutory proscription against compelling the enlargement of generating facilities is violated.

That portion of the Commission's order requiring Otter Tail to grant a credit for the costs incurred by Elbow Lake in purchasing its generating plant is set aside.

---

5. The Presiding Examiner held that this "credit" constituted an indirect violation of § 202(b)'s proscription against forcing the enlargement of generating facilities. In so holding the Presiding Examiner stated:

In substance, Staff's recommended capacity credit would require Otter Tail and its customers to pay for Elbow Lake's ill-advised excursion into the power business. If the credit is applied during the entire life of the Elbow Lake bond issue, the total of the capacity credits will equal the total cost of the generating plant, including both principal and interest charges. Ironically, while paying for the plant, Otter Tail would acquire no title or interest in the property other than a right to require the operation of the equipment after 12 hours notice. [The Commission's order ultimately required "reasonable" notice].

He also found that:

[T]he credit serves as a means for enabling Elbow Lake to recoup at the expense of the Otter Tail rate payer the money committed for the purchase of the generating equipment.